My name is Alex Beard and I, along with my partner Mark Johnson, represent the appellant in this case, Aggie Investments, LLC. Aggie Investments owns and operates a small spice and tea gift shop located in downtown McKinney, Texas. Like Terry Black's BBQ, my client had an insurance policy which insured direct fiscal loss of or damage to property. But our case is a little different from Terry Black's in two respects. One, we were completely shut down by the Mayor of McKinney's order. It stated that all businesses in McKinney were required to cease all activities at facilities located within McKinney. So, we were completely precluded from using the property. Our case is also different from Terry Black's BBQ in that we really, more so than in any really other case, we focus on the fact that this policy language is ambiguous or reasonably susceptible to more than one interpretation. And we think ours is probably, of all the cases out there, ours is probably the best case to make the argument on ambiguity. And that's because our case was decided by Judge Amos Mazzon, who just weeks earlier in another similar decision called Celery Fulfillment, made the statement that the most reasonable interpretation of the policy language favored the insurer. What he didn't say was . . . Favored the which? Which one did you say he said? He stated that the most . . . Insurance companies had the most reasonable interpretation. But he didn't say it was the only reasonable interpretation. And by saying . . . He's not writing a statute, so trying to construe it, you know, the textual analysis of a district court's opinion in some other case strikes me as a little . . . He was directly on point, and he went right to the heart of the issue. He very specifically made clear, at least you have to give effect to his words. I don't think that federal judges are really loose with language, and I think he truly believed that there was more than one. No, I mean, we don't have to agree with him. That's why we're an appellate court. So it's not, again, like that's a statute that we have to do this very deep textualist analysis of. It's something he wrote, and you are construing as meaning, well, there must be two reasonable, and that's binding on everybody. I have deep respect for Judge Mazam, but what he says is not binding on us. It's not binding, but it is one piece of . . . many pieces of persuasive evidence that this policy language is ambiguous. I think that this court could follow his lead and say the most reasonable interpretation is, but still rule in our client's favor, and that's because of the Texas special rule that we talk about in our . . . I mean, at bottom, the appeal is from the judgment, not . . . At bottom, an appeal is from the judgment and not from the reasoning. We get all kinds of cases where district courts say a whole lot of things, and even with great deference, sometimes we decide them for the reasons they did, sometimes we decide them for different reasons, sometimes our holding is more broad-based, et cetera, et cetera. I get your point. It's an ingredient, shall we say, in your argument, but you seem to be making too much of us following that thought pattern on down to the end. Let's back up to your other point, and that's just you're lobbying ambiguity up here, which is a different notion, that it's ambiguous, that it hadn't been argued as such. As opposed to my reading is the reading, the other one is not, there are two reasonable interpretations, therefore, ensured wins, and then ambiguous. There's no reasonable interpretation, so you're riding in on the ambiguity . . . Absolutely. Okay. Absolutely, Your Honor. And so the issue really today isn't which parties . . . in all these cases, they're fighting over whose interpretation is correct. The lawyers are always swinging for the fences, but they don't have to. Let's talk about this special rule of construction. I thought, hmm, I'm well aware, and I did insurance cases for many years, I'm well aware of the notion that if there are two reasonable constructions, you go with the insured one. But the Texas Supreme Court has never said, man, we're out there, we are going to deeply search deep into the earth to find something for the insureds, regardless of what the other 49 states say. I mean, you're kind of arguing that, man, we can't look at what anyone else says, because Texas has this very unique way of looking at things, and that's just not my impression of the Texas Supreme Court in insurance cases at all. No, no. The Texas special rule . . . let me take a moment and talk about that. It does hearken back to the canon of construction, contra pro forentum, which is in general contract law, we're going to strictly construe language, the contract language, against the insurer. When you apply that principle to insurance policies in other states, courts do one of two things. They either adopt one interpretation, and that's it, or they say if the, if the, if there are two equally reasonable opinions, then we're going to give it, the tie goes to the runner. We're going to give it to the policyholder. So they didn't draft the contract. Well, Texas, this Texas special rule is contra pro forentum on steroids, because it requires this court to adopt the, the insurer's interpretation, just provided it's reasonable, even if the court believes . . . Yeah, but they were very clear in National Union v. CEI that this is not like, again, digging deep into the earth to see if we can find a molecule that goes your way. I mean, it does have to be reasonable. And the fact that lawyers can make an argument does not mean that there's two reasonable constructions, because I have yet to see a case in all my years as a state trial judge in Texas, and now as an appellate judge in the Fifth Circuit, where lawyers can't make an argument on behalf of an insurer, and I respect that. Well, you don't need to just look at lawyers and the arguments. All you have to do is look to the handful of opinions from the judges, albeit in the minority view, but the handful of decisions from the judges that have weighed in on this. And the Henderson . . . But one of them just got reversed. What's that? One of them just got reversed in the Sixth Circuit, right? Well, that's, that's true, but even in that case, in Ray Zurich, America, in the court, the Court of Appeals stated that there is a substantial difference of opinion among the courts on this coverage issue. So even in rejecting the Henderson Road judge's decision, even, even the Court of Appeals acknowledged that there's a substantial difference of opinion, that it's a recognition that you can be wrong, but that doesn't mean you're unreasonable. These judges, these are, the judges in these cases . . . Well, Miss, under your theory, which I don't think I've ever heard in 35 years of practicing law, I, your theory is if you can find a judge somewhere in the United States who said what I say about the policy, I'm done, I'm finished, it's reasonable. Not at all. That is not at all. So, well, how many judges does it take then? Well, I don't know where the bar is, and especially when we take into account all the other evidence of an ambiguity, where that is. But in our case, we're not talking about two rogue judges in some far remote, you know, jurisdiction that issued some willy-nilly decision without any logical reason. These are decisions by U.S. federal district judges, very highly regarded and intellectual judges. Okay, but we have reversed incredibly fantastic, brilliant district judges in our lives, okay? So the fact that you have a brilliant, wonderful, amazing district judge does not always make them right. I mean, that's why we have appeals. And I have reversed people I deeply respect, okay? It's just how it works. You can disagree, but it doesn't mean that their opinion is unreasonable, simply because you might think they're wrong. Right. Well, it doesn't always have to, and . . . Circle back to your ambiguity and or whatever you're arguing about the policy. I think we get your, there are judges who agree with you, so maybe you want to shift to something else. Well, there is an abundance of other evidence establishing that this policy language is ambiguous. And first, I need to go back, because I was here during the Terry Black's argument. And one of the things that was mentioned is that, you know, we give the words their ordinary meaning. This is one of the three main rules of contract interpretation. And I think one of the mistakes that the courts have made, including that Michael set a court that now a lot of courts, it's a New York decision. I think the problem is, they're not looking at the policy language through the lens of a reasonably intelligent layperson. And that's what's required. So what we see is, these courts, like in the Michael Seta case, they rely on Black's Law Dictionary for the meaning of loss, and it's very narrow. And that's not how normal business people or just reasonably intelligent people view things. You have to look at Webster's Dictionary. And I'm not splitting hairs. I mean, a reasonable person would realize that loss can mean many different things. But, you know, even in insurance policies, you follow the rule of trying to harmonize the policy. And one of the arguments you heard in the Terry Blacks is this notion of restoration, so on and so forth. So you look at the whole thing. You don't just say, oh my gosh, loss, and you throw it out in the space. You look at the whole policy, and you say direct physical loss, so on and so forth. You look at the whole thing. So talk to me about harmonizing the whole relevant part of the policy, how that gets you where you are. I'd be happy to, because there's a provision in the policy that I need to bring to the attention, and it only came to our attention based on their recent supplemental legal authorities that they filed that included the Santos case. Well, in the Santos case, they talked about a particular policy exclusion. And there is a policy exclusion, a similar policy exclusion in our case, but, and I have the handout. I'm not sure if you have it in front of you. Is this what you put up here? Yes, Your Honor. It's from page 52 of the record. And that is, if you'll look at the ordinance or law exclusion, and understand, we're not talking about whether the exclusion applies right now. The only ground on which they moved to dismiss was that there was no coverage under the insuring agreement. But the exclusions in the policy helped define the scope of coverage. So you have insuring agreement, and then whether any policy exclusions apply. And if you look at this ordinance or law exclusion, it states that the policy, it states that the policy, that the exclusion applies to loss even if the property has not been damaged. Well, if the exclusion can apply to loss even if the property has not been damaged, then that necessarily means that loss does not require property damage. So if you want to give effect to all of the provisions in the policy, this, this has to be given effect. And this is a direct impact on their interpretation of direct physical loss, which is the total destruction of property. You can't read those together. This is in direct conflict with their interpretation of what direct physical loss means. And that means the policy is ambiguous. Right there. That means it's ambiguous. You don't even have to worry about our other five indicia. What if the loss is that they took the property away? I'm sorry. What if the loss is that the government took the property? Well that would be a dispossession. That's not a damage, but that's a loss. Is that what that's referring to? Well, all I can say is the way they've set up this policy, loss doesn't require physical damage. It just doesn't. There's no, you have to read. That's the other rule of interpretation as well. We don't read into the policy. Well, the word physical simply means that you're dealing with, you know, relating to material things. You're being dispossessed of your use of the premises. And the judge in the Derrick Scott Williams case was applying Texas principles and he concluded that physical loss was broad enough to encompass the deprivation of the use of the premises. And that's what we're talking about. We were completely shut down. We believe at the end of the day, when you look at all of this so-called non-dispositive evidence of ambiguity, you're going to see that it actually does establish. You think you could win even if Terry Black's barbecue loses? Is that your argument? I think that if it's ambiguous as to our client, I think it's ambiguous as to them. No, because you say you were totally shut down and they were not. Oh, oh. There could be a difference there. But in the sense that we're dealing with the Texas special rule, our case and Terry Black's are outliers. Thank you, Your Honor. All right. Thank you, Mr. Beard. We have the opening argument in reserve for rebuttal. Mr. Shanmugam. Thank you, Judge Stewart. Canon Shanmugam of Paul Weiss for Appalachian Continental Casualty, an affiliate of CNA. May it please the Court. The Court has been very generous with its time this morning in these two cases. And so I think with the Court's leave, rather than repeating things that have already been said, I'd like to make just a few additional points that will hopefully be helpful to the Court in writing its opinion. And of course, it goes without saying that I'm happy to answer any questions that the Court might have. First of all, I think it's important to remember that this is a property insurance policy. It differs in certain respects from other types of policies. And in particular, with regard to the requirement that we're discussing today, the requirement of direct physical loss of or damage to property, that is not some esoteric requirement, as Judge Stewart pointed out. Instead, it's really the central requirement, as Ms. Foggin pointed out as amicus in the last argument. And it's the central requirement, not just for the business income endorsement that is at issue here, but for basic coverage under these policies. So what do you do with the argument that they made about this ROA 52, the exclusion of plots where the loss results from an ordinance or law that's enforced even if the property has not been damaged? Sure. So I think that that goes to what was going to be my second point, which is the relationship between loss and damage. And as you pointed out, Judge Haynes, I think that has a bearing on the language in the ordinance or law exclusion. So that is really the hook in both of these cases for the argument on the other side. And that argument really turns centrally on this vaunted use of the word or, loss or damage. Now, of course, it's not at all unusual in insurance policies to have overlapping concepts. And Chief Judge Sutton, in his opinion for the Sixth Circuit in the Santos case, points out that the people who draft insurance policies often use multiple terms where only one term would do. But I think for purposes of this argument, Judge Haynes, the key point is that these are overlapping terms. And I think that that's easiest to understand in the context of personal property where it's very easy to conceive of loss without damage. And, of course, the paradigmatic example of that is theft of a piece of personal property. Now, that may be a little bit harder in the context of real property. I think what I would submit to the Court is that when you talk about loss in the context of real property, you're really talking about a complete loss. So if the property burns down as opposed to simply having smoke damage, I think we would say that that's a loss, even though that's... Are you saying this A to A reference is talking about personal property? Well, I think that to the extent that that reference talks about damage and doesn't talk about loss, I think that the fact that you can have loss without damage is a sufficient response to that. And loss without damage, you're saying, is in personal property. I mean, you don't think... You agree with the Terry Black's Barbecue folks that said that the state, you know, taking the property and building a highway in place of it is not covered? I think that may actually be different. And I think that goes to the meaning of direct physical loss. And I think, you know, the only point I would make for purposes of the relationship between loss and damage, Judge Haynes, is that even for loss, whatever the relationship between loss or damage, you have to have direct physical loss just as you have to have direct physical damage. And so I think that brings us squarely to this question of what direct physical loss actually means. And I think on that issue, I would actually go back to the argument made by counsel for... Is condemnation covered or not? I think that it may be covered if you have a complete loss of the property in the sense that in that circumstance, it is as if somebody just took your property entirely. Now, I'm not aware of any cases addressing that circumstance, and, you know, there may be issues about the availability of endorsements on other grounds, but I think it's a lot easier to conceive of a situation where the government just takes your property as a direct physical loss. I think a limitation on uses of the property is different, and I think that that's different regardless of whether it's a limitation only to take out dining or whether it's a prohibition on any sort of dining, which seems to be the argument that counsel in this case is making in an effort to distinguish it. Okay. So you're saying we got to come out the same way in that case and this case. I think the court has to, and let me try to explain why and really drill down on the argument that I think the other side is making as a textual matter here. So I think counsel for Terry Blacks set out the argument in perhaps a little more detail. So what I heard her to say is that the meaning of direct physical loss is a deprivation of physical space for an intended use or, I think she said later in the argument, a restriction that renders it unavailable for intended use. I think the fundamental problem with that is the one that Judge Graves identified, which is that the loss itself has to be direct or physical. And I think that that alternative definition is really just loss of use by another name and a limitation on use cannot be a physical loss of property. And let me give an example that I think illustrates why that interpretation can't be correct. Let's say that I run a restaurant in McKinney and let's say that the McKinney public health inspector comes by and says, Mr. Shanmugam, you've got rats. I'm going to have to issue an order shutting you down. I think that exactly the same argument could be made on the other side, but I'm certainly not aware of any case law and I think it would fly in the face of common sense to say that that's a direct physical loss of my property simply because there's a shutdown order for some other reason. And, of course, we know that those sorts of shutdown orders occur all the time. Rats might eat your property. Well, if they ate the property or did permanent damage to the property, that would be different. That might be the paradigmatic situation of direct physical loss where you would have to have a period of restoration. Now, mere cleanup. Exorcised rat. I have to say we have some pretty big rats in Washington, D.C. as well. But I think, and I would just note parenthetically that if you merely had to clean up after the rats, that would not be sufficient for the reasons that we say in footnote one of our brief. But I think the right way to conceive of this situation, and I realize that conceptually it's a little bit hard, is the way that Chief Judge Sutton suggested in the Santos opinion for the Sixth Circuit, which is that this is really kind of akin to a temporary rezoning. It is as if the government said, we're going to rezone your property for a temporary period so that you can only have takeout dining. And I would note parenthetically that if you look at the shutdown orders here, that is basically what they did. And so while it is true that counsel for Aggie, my friend Mr. Beard, now suggests that the restaurant, that the spice and tea shop had to close down entirely, the shutdown orders here consistent with the shutdown orders elsewhere in Texas did permit some use for dining purposes. But I think our submission is that, you know, if you think about this as a temporary rezoning for takeout dining or as Ms. Foggin suggested as sort of the equivalent of a change to closing hours, you know, that really underscores that what's going on here is simply a limitation on use. And it's not even foreclosing access to the property, never mind taking the property permanently as in your condemnation hypothetical, Judge Haynes. So I think that the Court can comfortably write an opinion here that rejects the sort of broader loss of use theory while recognizing that there may be situations in which what's going on is really tanimous. So how do you deal with all these brilliant district judges construing it the way your opponent says and that that means it's a reasonable construction, even if yours is a most reasonable construction or whatever Judge Mazzant called it? Judge Haynes, I would submit that it's not surprising on any issue where you have hundreds of judges around the country addressing the issue that some have come out the other way. I think at last count there were approaching 700 judges who had come out our way. I'm not sure exactly how many had come out the other way, but it's a significant minority. But what's interesting is that both this Court and the Texas Supreme Court have indicated unambiguously that the mere fact that judges have come out the other way, while it might be evidence of ambiguity, does not establish ambiguity. You know, I agree that we don't need to certify the question of whether one judge in the world thinking something different creates an ambiguity, but what about the certified question that the Terry Black's Barbecue asked for? Basically the bottom line here, what does direct physical loss mean? Tell us, Texas Supreme Court. Should we do that? Yeah. So given the level of experience on this panel, I don't need to tell you that whenever you have an area question, you don't automatically certify. You only certify in circumstances involving a genuinely open question where you think there's some possibility that the state Supreme Court, here the Texas Supreme Court, would come out the other way. And I would respectfully submit that there's no reason to believe that the Texas Supreme Court would do that. As Mr. Fleischer noted in his argument in the Terry Black's case, the authority that we have from the Texas state courts, and particularly the U.S. Medals case, I think all do point in our direction. And I would further note, as you discussed in your colloquy, Judge Haynes, with Mr. Beard, that the Texas courts apply the same interpretive principles as courts in other jurisdictions. This was the first time I heard that Texas was just floating around somewhere. I mean, that was odd because the Texas Supreme Court is very big on if you have the same policy and you're living in Illinois or you're living in Montana or you're living in Texas, it probably should come out the same way. They can't make it come out the same way, but it probably should. I think that's right. And while I'm willing to grant that there may be some differences in formulations from jurisdiction to jurisdiction, I think we're all familiar with the general contra-proferentum principle that applies in insurance cases. I respectfully don't think that the Texas Supreme Court applies a steroidal version of that principle, as my friend Mr. Beard suggested. And I would point the court to the Mount Holly case from the Southern District of Texas that we cite for the proposition that as across the relevant jurisdictions, and in particular Louisiana and Mississippi, which were the jurisdictions at issue in the earlier cases from this court construing identical language, that the principles apply the same. The North American shipbuilding case that was cited by counsel for state auto in the last case from the Texas Court of Appeals also makes that point. And that's obviously important because we do have authorities from this court construing the same language, albeit applying Louisiana and Mississippi law. And so I think the question is really whether there's any reason to think that the Texas Supreme Court would come out differently. And particularly given the United States Metals case, which does construe the term physical, albeit in the context of a CGL policy, but I think at least for purposes of the meaning of the word physical, there's no reason to treat those types of policies differently, all the indicia in Texas really point in the same direction. And I think it's telling that we now have, as of today, four courts of appeals, the Sixth, Eighth, Ninth, and Eleventh, that have all come out our way on this question. There are no courts of appeals that have come out the other way. And tellingly, none of those courts of appeals has certified. And having argued the Sillane case in the Ninth Circuit, which was the companion case to the Mud Pie case, the court certainly asked exactly the same question about certification. And I think that the court ultimately concluded there that certification was inappropriate. And certification obviously has costs, both in terms of the burden that it imposes on the busy state courts and the delay that would result from sending this case to the Texas Supreme Court. So again, I think in the absence of any reason to believe the Texas Supreme Court would come out in plaintiff's favor, that certification here would be inappropriate. As you note, Mr. Beard, you know, front-ended his argument, you know, with this notion of ambiguity as opposed to my reading is the reading, et cetera, et cetera. I think I know what your response is, but would you elaborate? Sure. Judge Stewart, I think ultimately the fundamental problem that the plaintiffs have in these cases, and of course we all recognize the plight of these companies in the wake of COVID-19, but the fundamental problem that they have is the inability to give meaning to the word physical. And I think that the mere fact that you can come up with a way of conceiving of this as a limitation on the physical space doesn't get around the problem that the loss itself has to be not only physical, but also direct.  What about or? Well, again, I think that the most you can say about or is that the terms loss or damage are overlapping. And I think, frankly, even if they were completely overlapping, my point would be the same, which is that you have to have direct physical loss or damage. But again, as long as they're not completely overlapping, and we talked about, you know, in particular the examples of loss without damage such as theft, as long as there's some things, I don't think that the court ought to be concerned about the fact that, as Mr. Feicher said, there are circumstances in which there's overlap in the Venn diagram. There's circumstances in which you obviously have both. Those terms are obviously meant themselves to be broad. The key point is that the phrase direct, the adjectives direct and physical impose an important limitation. And the other sort of source of the suggested ambiguity is in the exclusions. We've already talked about the ordinance or law exclusion. Obviously, there are other exclusions at issue in these cases, such as the microbe exclusion or the exclusion for consequential use. Now, I want to underscore, as Mr. Beard pointed out, that we didn't rely on those exclusions. We relied simply on the absence of coverage. It is, of course, the burden of the insured to establish coverage here. And this court has recognized that the mere fact that there are exclusions can't create coverage. The question of coverage really is an antecedent and logically precedent question here. And I think that that question is a centrally important one to insurance companies like my client for the simple reason that across these policies, the exclusions vary. There are some of these policies that don't have the exclusions. And so this fundamental question of whether this constitutes direct physical loss or damage is centrally important. I would just make one point about the exclusions more generally. And that is that, you know, exclusions often do serve a belt and suspenders purpose. It's not at all unusual to include exclusions to reach situations where there might not be coverage. I would not at all be surprised if going forward insurance companies include express COVID-19 exclusions. And by doing that, they would not be tacitly acknowledging that there is coverage under these insurance policies. Rather, they would simply be adding those exclusions in order to eliminate any residual suggestion to the contrary. And so, again, to the extent that Mr. — Like carrying a gun and a knife? Sorry? Like carrying a gun and a knife to defend yourself? Well, I think if you look at the exclusions, and they're obviously quite extensive, I don't think that you would say in a property insurance policy that the inclusion of all of those exclusions indicates that there must be coverage for those things absent the exclusions. And so my point is simply that to the extent that Mr. Beard and others in this litigation have attempted to draw inferences from the scope of these exclusions, that the court should be wary about doing that, particularly given that the language of the coverage provision is unambiguous. Unless the court has any further questions, I would respectfully submit that the judgment should be affirmed. With respect to the other cases, and I know you argued the Ninth Circuit, has the quality of the inquiry been essentially the same in these cases, maybe other than the certified piece, but essentially the courts are drilling in on the same focal point in terms of physical? Is that kind of where it drills in? I think that's right. I mean, Judge Stewart, I would really encourage the court to look at all of the court of appeals decisions that have come down just in these last few weeks, and particularly I think the Sixth Circuit's decision in the Santos case, which is probably the most comprehensive. But I think you would find that there is a great deal of commonality of reasoning in these cases. And I think you're right, Judge Stewart, that there have been requests for certification in some of these cases, but not others. And at least at the court of appeals level, no court of appeals has certified any question, whether it's the broader question of what the policy language means, or any of the threshold questions concerning interpretation. And again, I would note in this case that the only question that the plaintiff has asked to have certified is this question about the meaning of ambiguity. And again, I would respectfully submit that the Texas Supreme Court in the United States Metals case has already answered that question when it said that a policy provision is ambiguous only if it is subject to more than one reasonable interpretation, and not merely because the parties or other courts differ over its interpretation. All right. Thank you. Any other questions from the panel? All right. Thank you very much. Appreciate it. All right. Back to you, Mr. Beard, for rebuttal. Just a couple of quick points on rebuttal. First of all, I think I need to make clear that there was a complete shutdown of our operation. When we say we're a spice and tea shop, it's dried tea, so we don't serve liquid tea. We don't serve customers like that. There's no in- Is there a mail order business? I mean, a mail order aspect? Frankly, I'm not sure, Your Honor. I'm not sure, and I know that's not in the record. I just ask, because I mean, I buy a lot of tea online from places that I don't find it, and so it just had me thinking when you were saying there's no served tea, I just wondered somewhat analogously whether, and when you say completely shut down, if there was an aspect of the business, you know, like online orders, et cetera, that did continue notwithstanding the shutdown. Do you follow me? It's possible, but we know that the physical premises could not be used. In that sense, we're not ignoring, as my opponent says, the whole concept of physical. As a matter of fact, we go into great detail, and we provide a hypothetical on our brief about the comparison between this type of order that completely shut us down from using the premises and a governmental order that might prevent us from, you know, making a certain product or something like that. That would be purely economic loss, but not when we're dispossessed and prevented from using the physical space. So from the time of the shutdown order till whenever, your clients were, I mean, it was like zero. That's right. Space, empty, abandoned, not abandoned, but . . . Unless they did some type of mail order, that's correct. Okay. And so they couldn't do pickup, people couldn't come out in the parking lot and pick up spies? I have no reason to believe that's the case, and I don't think it was addressed in Mark Gerber's affidavit. We moved for partial summary judgment as well, but no, I have no reason to believe that's the case. Okay. You're sure? Because, I mean, I just honed in when you started with saying our case is different because we were completely shut down, zip, da-da, as opposed to you heard the questions we asked Terry Black, they acknowledged they had drive-thrus, et cetera, but they still made their argument. And so when you say completely, you know, that can only have one meaning, completely. So if the record or something suggests, yes, there was a diminished operation, less dollar-wise than people coming in, but if the employees were able to come in, fill online orders, you know, ship, et cetera, that, to me, is something different than completely shut down. Well, and I was just referring to the actual language of the shutdown order. No, I get you. I was asking a factual question, and that's why we set it for an argument, because you in command of the case and what happened. And so I wanted to know, because you said completely shut down. And so when you said spice and tea, as I said, pre-COVID, people order stuff online, it's an aspect. Judge Haynes asked a question to someone other than said, well, maybe less money, but they might in fact make more money from that. So if you don't know the answer, that's fine. It may be interrupted. I just wanted to know. I just know that they followed the ordinance, it wasn't an ordinance, excuse me, but they were required to cease all activities at the facility. Okay. So in terms of that law or ordinance exclusion, my opponent attempts to wiggle out of that by saying that it's... Why are you presenting this? I mean, you put it up here this morning, and I'm always weary of stuff I get on the bench, you know, when they've been all these 28Js filed, I mean, there's been no shortage of papers. So is that, you know, I get the last volley with this to want to argue that an endorsement some kind of promotes coverage? I mean, we see that in auto policies, et cetera, is it just an addition to the argument? I'm not quite getting how that gets you to home plate. I know, Your Honor, and the reason we raised it and the only reason it came to our attention was because of the Santos Italian Cafe case, because they talked about it, and that caused me to go look at our law or ordinance, and I saw that language. If that wasn't raised in the district court, can we consider it here from the appellate? Well, I think so, because what we're talking about is everything impacting the meaning and deriving the meaning of direct physical loss. And so, like you said earlier, Judge Haines, you know, you look at the whole policy. You try to give effect to all of the language, and if you give effect to all of the language, that has to, that runs right up against their . . . Well, what about your Chamagian point that, you know, insurance companies put a lot of exclusions that cover things that would, that address things that would never be covered anyway. So in other words, an exclusion doesn't prove what's covered. It just, you know, adds another swift uppercut to the whole thing of what's not covered. And how fair is that? How unfair is that? I mean, this language, direct physical loss, has been around for decades. They could have changed it. They could have modified it. They could have, by endorsement, defined these terms. Well, the exclusion's been around, and you just put it up here. It was discovered because of Santos. Exclusion's been in here the whole case. You never made this argument. It just sounds to me, implicitly, you're trying to say, well, the endorsement provides some, you know, they're acknowledging that there must be coverage because they got an exclusion. That's what it sounds to me, even though you're not saying that. It wasn't argued below. It wasn't argued in the briefs. It's put up here to argue language in here without saying, here's some additional fodder for it. You may have been doing it, but I'm just telling you, it sounds like making an argument that an endorsement, if so facto, can lead to some coverage, and there's no case saying that. You don't argue that. It's not up here. I have serious questions. It wasn't raised below. I'm just telling you. Well, I think it's important for the court to, I see that I'm out. I understand the light is only going to turn that one shade of red, but, you know, as long as we're asking questions, you know, that's why we have it here. You're helpful. Keep going. It's important for the court to keep in mind the role that policy exclusions have in shaping coverage. Okay, the first task of the court is to determine whether there's coverage under the insuring agreement of the policy, and that burden falls on the policyholder, and that's where the direct fiscal loss language comes from. Okay, once you establish that there's coverage under the insuring agreement, it's then and only then that the policy exclusions come into play, and exclusion, as its name implies, means it takes away what would otherwise exist under the policy. So that's the best way I know how to explain it. Well, you're an able lawyer. You think well on your feet, and so you have responded quite well to the question. That's why we like oral arguments, so we can get the answer to these questions. So your time's exhausted. We appreciate the briefing and argument. Like I said, it's not lost on us. It's a very important question, you know, because definition, but we make a living reading policy language. So we'll drill down on it and make the best determination. I hope you read it through the lens of a reasonably intelligent person. I'm going to read it through the lens of an Article III judge is the way I'm going to read it. Just like our judges did in our cases. Thank you. All right, I'll let you have the last word, Mr. Beard. That's pretty good. All right, well, thank you, counsel. This completes the arguments in the cases.